IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LANCE QUEER and INTEGRATED CARE CORPORATION, | ) ) ) |
| Plaintiffs, | ) 2:06-cv-325 ) ) |
| v. | ) ) |
| WESTMORELAND COUNTY, CHRISTOPHER LOUGHNER, CORRINE ZECCHINI and AUSTIN BREEGLE, | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM ORDER**

Before the Court for consideration and disposition are the following motions: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 23); DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 26); PLAINTIFFS' MOTION TO STRIKE VARIOUS PARAGRAPHS OF DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS (Document No. 31); and PLAINTIFFS' MOTION FOR ADDITIONAL DISCOVERY PURSUANT TO RULE 56(f) (Document No. 32). The issues have been fully briefed, and the matters are ripe for disposition. *See* Document Nos. 24, 25, 27, 28, 30, 33-35, 37-40.

Background

This lawsuit arises out of the non-renewal of a contract to provide Early Intervention (EI) services to special needs children. Plaintiff Integrated Care Corporation ("ICC") had entered a series of one-year contracts with Westmoreland County, beginning in 1999. Plaintiff Lance Queer is the sole owner and officer of ICC. Defendant Chris Loughner is a Program Specialist employed by Westmoreland County to monitor Early Intervention service providers. Defendant Corrine Zecchini was the MR Program Coordinator, and Loughner's supervisor. Defendant Austin Breegle is one step above Zecchini in the management hierarchy, serving as the Deputy

Administrator reporting to Kathleen Wohlgemuth *nee* Clingan, Westmoreland County's MH/MR Administrator. Wohlgemuth, in turn, reports to the county commissioners, who have authority to enter into contracts on behalf of the County.

Westmoreland County administers an Early Intervention Program for children 0-3 years old with special developmental needs, pursuant to the Individuals With Disabilities Education Act (IDEA). The County is required to offer a freedom of choice among qualified service providers to the families of eligible children. The County is also required to monitor the performance of providers offering such services. Plaintiffs aver that the County did not conduct such monitoring in 2002 or 2003 and that there are no performance standards or guidelines, other than the subjective judgment of Defendant Loughner.

In March 2004, Lance Queer informed a state official, Frank Comport, that Loughner was improperly denying services. In an April meeting between Comport and Loughner, this criticism was raised and Loughner became angry at the accusation. Loughner demanded a hearing from the state to exonerate himself, but later withdrew the request under pressure from his supervisors.

On June 11, 2004, Loughner, Zecchini and Queer met to discuss numerous issues regarding ICC, including an email in which Queer referred to service coordinator Colleen Stulak as a "she wolf"; an email sent by Queer to Loughner that contained pornography; "outreach" or promotional activities conducted by Plaintiffs; and training shortcomings of his staff. In July 2004, Westmoreland County renewed the yearly contract with ICC for the 2004-2005 fiscal year, although the amount of the contract was reduced approximately 25%.

In October 2004, the County reviewed records and prepared a report regarding ICC's performance. The report was distributed to Plaintiffs in February 2005. The report identified concerns, strengths/positives, and compliance issues, and directed ICC to provide a "Plan of Correction" regarding the specific shortcomings which had been identified. In March 2005, the parties met to discuss the monitoring report and compliance issues. Lance Queer stated that he would make sure that things were in compliance. During this timeframe, the County also secured

some additional funding to enable ICC to continue to provide services to the eligible families.

On March 17, 2005, Plaintiffs submitted a letter that Defendants describe as "the straw that broke the camel's back." The six-page letter was a response to the February report and purportedly served as a plan of correction. Plaintiffs concede that the March 17 letter was presented "in a strange syntactical or grammatical fashion" and was "unprofessional." In one portion of the Letter, Lance Queer stated that if a therapist demonstrated "non-alignment" with proper policy, "i will probably personally shoot them...." [sic].

Upon receipt, Zecchini reported her concerns about the letter to Breegle. Breegle then met with Wohlgemuth, who asked for Breegle's opinion as to whether ICC's contract should be renewed and Breegle then undertook an investigation. On April 21, 2005, Breegle prepared a memorandum in which he recommended that ICC's contract not be renewed.

Breegle's memorandum cited the following reasons: (1) the "she wolf" email; (2) the pornographic email; (3) an incident Breegle witnessed in September 2004 at a county MR managers' meeting, which Lance Queer interrupted while dressed in a hula skirt and coconut bra, placed Hawaiian leis around the necks of Zecchini and the Butler County MR Coordinator and loudly stated "I bet you have never been [lei'ed]/[laid] by a queer before"; (4) continuing EI regulatory compliance issues; and (5) the March 17, 2005 Letter. Breegle then explained his conclusion:

> This lack of insight to the inappropriateness of his behavior and results from it should not be exposed to the families and children of Westmoreland County. I personally do not want to be held accountable if something tragic occurred and I had this information and did not respond. I have re-reviewed all available documentation and correspondence and continue to recommend that this contract not be renewed.

Breegle and Wohlgemuth then made the recommendation to the county commissioners and met with them to discuss it. Wohlgemuth then notified Plaintiffs by letter that the contract would not be renewed and that all individuals served by ICC would be required to choose another provider by June 30, 2005. Wohlgemuth explained: "This decision was based on the unacceptable content in your Plan of Correction dated March 17, 2005." Lance Queer was given an opportunity to

meet with the county commissioners prior to the public meeting at which non-renewal of the contract was to be voted on.[1]

    A.    <u>Motion to Strike</u>

Plaintiffs seeks to strike paragraphs 1, 2, 4, 5-17, 64, 66 and 70 of Defendants' Consise Statement of Material Facts on the basis that these paragraphs put Lance Queer, personally, in a bad light. Plaintiff argues that the topics in these paragraphs are not relevant and invite the Court to make credibility determinations that are not appropriate at the summary judgment stage. Defendants contend that the paragraphs at issue are relevant, insofar as they reflect the types of concerns that the County raised to support its decision to not renew its contract with ICC. Defendants further argue that litigants cannot avoid summary judgment by providing incomprehensible or self-contradictory testimony.

As stated in *Ammirati v. Bonati*, 1994 WL 34175 (M.D. Fla. 1994), motions to strike "are not favored, often being considered "time wasters," and will usually be denied unless the allegations have no possible relation to the controversy and might cause prejudice to one of the parties." (citations omitted). In order to rule on the Motion to Strike, the Court has been required to read and analyze the disputed portions of Defendants' Consise Statement of Material Facts and Plaintiffs' responses. The Court is aware of its duty to construe the summary judgment record in the light most favorable to the non-moving party and the Court will not make any adverse credibility determinations affecting Plaintiffs. In particular, the Court rejects Defendants' suggestion that Mr. Queer should be categorically barred from testifying at trial pursuant to Fed. R. Evid. 403. However, the Court will consider the evidentiary record as a whole to determine whether or not a reasonable factfinder could find in Plaintiffs' favor on the merits of the claims asserted in the complaint. Accordingly, PLAINTIFFS' MOTION TO

---

[1]Plaintiffs do not deny that they were given notice and the opportunity to be heard, but argue that the commissioners deferred to the recommendation made by the staff and did not personally read the contracts.

STRIKE VARIOUS PARAGRAPHS OF DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS (Document No. 31) is **DENIED**.

      B.      <u>Motion for Additional Discovery</u>

On July 18, 2007, long after discovery closed and summary judgment motions and briefs were filed, Plaintiffs filed a motion pursuant to Rule 56(f) for additional discovery.  Plaintiffs contend that the County has recently provided information to the Commonwealth of Pennsylvania about ICC's status as an early-intervention provider.  Plaintiffs contend that such information falls within Defendants' duty to supplement their discovery responses.  Plaintiffs further assert that the communications "could shed light on the County's motives for acting to remove Integrated Care's contract, as well as establish that a new violation of constitutional rights of [ICC] has occurred...."

Defendants respond that the motion is untimely, because both parties have had ample opportunity to complete discovery and there are no outstanding discovery requests.  Defendants further contend that the additional discovery is "in no way relevant" because the recent communications occurred on or after June 28, 2007 while the non-renewal of ICC's contract occurred two years earlier.

The Court agrees with Defendants on both points.  The docket reflects that numerous extensions of time have already been granted in this case.  The record is now complete, with discovery closed and summary judgment motions pending.  The relief sought by Plaintiffs would result in another indeterminate and unjustified delay.  Moreover, the recent communications are irrelevant to the issue in this case – the non-renewal of the contract in 2005.  Indeed, Plaintiffs admit that they seek the communications, at least in part, to explore whether a "new" violation has occurred.  Accordingly, PLAINTIFFS' MOTION FOR ADDITIONAL DISCOVERY PURSUANT TO RULE 56(f) (Document No. 32) is **DENIED**.

    C.    <u>Cross-Motions for Summary Judgment</u>

Both parties seek summary judgment. Counts I and II of the Amended Complaint allege First Amendment violations. Count III asserts an Equal Protection claim. Count IV asserts a Section 1983 claim in which Plaintiffs allege that Defendants violated their rights under the Medicaid statute. Count V is a procedural due process claim. Count VI is a substantive due process claim. Defendants seek summary judgment on all counts. Plaintiffs seek partial summary judgment on Counts IV and V. The Court will address each cause of action seriatim.

<u>Standard of Review</u>

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

<u>Counts I and II: First Amendment Claims</u>

Counts I and II assert claims on behalf of Lance Queer and ICC, respectively, alleging that Defendants terminated the contract in retaliation for comments made by Queer to state

officials about Loughner in March 2004. The elements of a First Amendment retaliation claim are: (1) that Plaintiffs engaged in protected activity; (2) that Defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights; and (3) that there was a causal connection between the protected activity and the retaliatory action. *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003). A defendant may defeat a retaliation claim by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity. *Lauren v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Defendants first argue that there is no evidence that Plaintiffs contacted state officials, citing the deposition testimony of Frank Comport – the official in question. However, Queer testified that the conversation occurred. At this stage, the Court will resolve the discrepancy in favor of Plaintiff and assume that Plaintiffs engaged in this protected activity.

Defendants also contend that there was no causal connection between the speech and the allegedly retaliatory action. To establish a causal connection, a plaintiff must prove either: (1) an unusually suggestive temporal proximity; or (2) a pattern of antagonism coupled with timing to establish a causal link. *Lauren*, 480 F.3d at 267. The Court of Appeals has instructed district courts to be diligent in enforcing these causation requirements to avoid chilling public actors from taking appropriate actions for fear of litigation. *Id.* at 267-68. These instructions are appropos to this case.

There is no evidence by which a reasonable factfinder could conclude that the non-renewal of the ICC contract was causally connected to any protected First Amendment activity. There was certainly no suggestive temporal proximity, as Queer's contacts with the state officials occurred in early 2004, over a year prior to the non-renewal. Moreover, there is no evidence sufficient to create a "pattern of antagonism." The contract with ICC was actually renewed for the 2004-2005 fiscal year -- after those alleged contacts. In addition to the renewal of the contract in July 2004, the record reflects that the county submitted a list of issues to enable Plaintiffs to create a Plan of Correction and the county obtained additional funding for ICC in

March 2005. There were numerous legitimate, non-discriminatory reasons for non-renewal of the contract, including concern for the families that would be receiving services. Even Plaintiffs recognize that the Plan of Correction submitted on March 17, 2005 was woefully inadequate and unprofessional. Plaintiffs strive mightily to bootstrap Defendant Loughner's dissatisfaction with Plaintiffs into a causal link, but that effort falls far short. There is no evidence that Loughner had any role in the ultimate non-renewal decision. The recommendation of non-renewal was made by Breegle and Wohlgemuth, who were two and three levels above Loughner in the organizational hierarchy, respectively. It is clear that Breegle performed an independent review of the file and had personal experience with Queer's conduct.[2] There is no evidence of antagonism by Breegle, Wohlgemuth or the county commissioners who actually made the final decision. In addition, the timing does not suggest a causal link to any basis for non-renewal prior to the March 17, 2005 letter. Accordingly, Defendants are entitled to summary judgment on Counts I and II of the amended complaint.

### Count III:  Equal Protection Claim

Plaintiffs assert that the unequal treatment in this case is that Loughner imposed different standards and rules on ICC from those imposed on other providers of EI services. In essence, Plaintiffs argue that Defendants engaged in "selective prosecution" and that the non-renewal of the contract was irrational and wholly arbitrary.

Both sides recognize that this is a "class of one" claim. Thus, Plaintiffs must establish that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiffs argue that a defendant should not be entitled "to hide behind a shield of a hypothetical 'rational basis' test." However, it is clear that the Supreme Court has

---

[2] The Court recognizes that documents prepared by Loughner were in the file. However, there is simply not sufficient evidence by which a reasonable jury could find Defendants liable under the "cat's paw" theory advanced by Plaintiffs pursuant to *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001).

held that the rational basis test applies. Plaintiffs must prove: (1) that they were treated differently compared to similarly situated persons/entities; (2) that Defendants did so intentionally; and (3) that there was no rational basis for the difference in treatment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). In *Marcavage v. City of Philadelphia*, 2006 WL 2338261 (E.D. Pa. 2006), the Court explained that the selective treatment must be motivated by an intent to discriminate on the basis of impermissible considerations, to punish or inhibit the exercise of Constitutional rights, or by a malicious or bad faith intent to injure. A plaintiff must identify a comparator who has been treated differently. *Id.* at *6.

   Defendants argue that Plaintiffs have not identified an appropriate comparator and that there were multiple rational reasons for not renewing the contract. The Court agrees with Defendants. It is far too simplistic to identify, as Plaintiffs have, a class of "other providers of EI services." The reasons cited by the county for non-renewal of the contract included several very specific circumstances involving Queer and/or ICC. Thus, the equal protection analysis must take into account whether any of the providers whose contracts were renewed sent pornography to county officials, called an official a "she wolf," or interrupted a high-level meeting dressed in a hula outfit. The analysis of whether a comparator exists must also consider whether the other service providers had been given a lengthy list of compliance issues and in response had sent an inadequate and "unprofessional" plan of correction that included a statement about shooting employees. There is no evidence in this record of any such comparator. Moreover, as discussed above, there are numerous rational reasons for non-renewal of the contract. In sum, it is not irrational and does not violate the Equal Protection clause when government officials stop contracting with persons who have engaged in deliberate unprofessional conduct. Concerns regarding inappropriate sexual and violent behavior by a potential contractor are particularly legitimate when that service provider will have access to special needs children aged 0-3. Accordingly, Defendants are entitled to summary judgment on Count III.

Count IV: Section 1983 Claim Regarding Rights Under Medicaid

Count IV asserts a claim by ICC against Westmoreland County, alleging that the county has violated the freedom of participants to select providers of their choice.  Section 1983 can, in theory, be used to remedy statutory violations.  However, if Congress has not created an enforceable right in the relevant statutory provision, then Section 1983 cannot be invoked. *Middlesex County Sewerage Authority v. National Sea Clammers*, 453 U.S. 1, 19 (1981).  The issue in this case is whether the "freedom of choice" rights under the Medicaid statute belong only to the program participants or also to the providers.

Pursuant to 42 U.S.C. § 1396A(a)(23), state plans for medical assistance must provide that "any *individual* eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, *qualified* to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services...." (emphasis added).  In *O'Bannon v. Towne Court Nursing Center*, 447 U.S. 773 (1980), the Supreme Court interpreted this provision to mean that recipients of services may choose among "qualified" providers, but may not demand a hearing or certification of an unqualified provider.  In 42 C.F.R. § 431.54(f), the implementing regulations provide a procedure for restricting providers.

The parties have not found any Third Circuit precedent directly on point and the Court has not located any such binding precedent in its own research.  The Court finds the following analysis in *Belen Consol. Schools v. Otten*, 259 F. Supp.2d 1203, 1210-11 (D.N.M. 2003), to be persuasive:

> In each case this Court has found addressing the issue of whether the freedom of choice provision confers upon a Medicaid provider a private right of enforcement, the court held that it does not. *See RX Pharmacies Plus, Inc., et al. v. Weil*, 883 F.Supp. 549 (D.Colo.1995); *Nutritional Support Servs., L.P., et al. v. Miller*, 826 F.Supp. 467 (N.D.Ga.1993).
>
> In holding that the freedom of choice provisions were intended to protect Medicaid recipients, and do not confer any enforceable rights on Medicaid providers, the court in *RX Pharmacies Plus, Inc*. explained that, as a general rule, the Medicaid statutes were intended to benefit Medicaid recipients, rather than

>Medicaid providers. *See also Geriatrics, Inc. v. Harris*, 640 F.2d 262, 265 (10th Cir.), cert. denied, 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981). Thus, while Medicaid providers have been permitted to bring actions challenging the Social Security Act, all such cases, most notably *Wilder*, have involved "reimbursement rates or payment procedures." *RX Pharmacies Plus, Inc.*, 883 F.Supp. at 553. Unlike the reimbursement provision at issue in *Wilder*, the freedom of choice provisions at issue here "do not in any way affect a provider's right to reimbursement or payment under Medicaid." *Id*.
>
>In *Nutritional Support Servs., L.P.*, the court explained that the Supreme Court in *Wilder* made a "threshold determination that health care providers are the intended beneficiaries of the Act's reimbursement provision," focusing on "the language and purpose of the provision." *Id.* at 469 (citations omitted). The statutory provision at issue in *Wilder* is "phrased in terms benefitting health care providers and establishes a system for reimbursement of providers." *Id*. (citations omitted). In contrast to the reimbursement provision, the freedom of choice provision gives "no indication" "that health care practitioners are given any rights." *Id.* (citations omitted). The legislative history of the freedom of choice provision "clearly focuses on the Medicaid recipient's right to choose the provider of his or her choice." *RX Pharmacies Plus, Inc.*, 883 F.Supp. at 554 (emphasis in original). Moreover, the Supreme Court has held that this provision creates rights in Medicaid recipients. *See O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). It thus follows that "the purpose of the freedom of choice provision was not intended to benefit Plaintiffs." *Nutritional Support Services, L.P.*, 826 F.Supp. at 470. If § 1396a(a)(23) was not intended to benefit Plaintiffs, it certainly does not give Plaintiffs "an unambiguously conferred right to support a cause of action brought under § 1983." *Gonzaga University*, 122 S.Ct. at 2275.

It is compelling that the statute at issue clearly frames the right of freedom of choice as belonging to the recipient. It is equally noteworthy that the statute explicitly limits recipients' freedom of choice to "qualified" providers. In sum, there is no statutory right of action for a provider whose contract was not renewed because it has been deemed to be unqualified. Defendants are entitled to summary judgment on Count IV.

### Count V: Procedural Due Process Claim

Plaintiffs claim that they were denied procedural due process. They point out, correctly, that a contract with a state entity can give rise to a property right protected under the Fourteenth Amendment. Plaintiffs then argue that they have a property interest because the Medicaid program requires notice and a hearing prior to termination of a provider, citing *Ritter v. Cohen*, 797 F.2d 119 (3d Cir. 1986).

11

Defendants point out that the Medicaid regulations permit the county to restrict an unqualified provider from participating pursuant to 42 C.F.R. § 431.54(f). Defendants also contend that Plaintiffs' argument is fundamentally flawed because they were not "locked out" – rather, the contract was simply not renewed, and there is no property right to automatic renewal. In addition, Defendants contend that Plaintiffs were given notice and an opportunity to address the issues before the county commissioners voted on the non-renewal of the contract. The Court agrees with Defendants.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). In this case, it is clear that ICC had a one-year contract with a definite expiration date. That contract was fully completed, thus the claim at issue is that the county did not enter into a new contract. "A bidder on a government contract does not acquire an enforceable property right to the benefit of the contract until the bidder is awarded the contract." *Municipal Revenue Services, Inc. v. McBlain*, 2007 WL 879004 (E.D. Pa. 2007). Moreover, the governing regulations explicitly limit participation to "qualified" providers. Plaintiffs do not have a legitimate right to enter into future contracts, regardless of the county's determination that they were no longer qualified.

The case relied upon by Plaintiffs, *Ritter*, 797 F.2d at 122, involved the termination of a physician. The Court assumed, *arguendo*, that the physician would have a property right if the regulations were interpreted to permit his removal only "for cause." However, the Court then found that the physician had received "all the process he was due." As explained above, *Ritter* is distinguishable because there can be no legitimate expectation to the renewal of a contract in the future. In addition, as in *Ritter*, the record reflects that ICC and Queer received all the process to which they were entitled. County officials confronted Plaintiffs with a lengthy list of issues and asked for a Plan of Correction. After receiving the unprofessional response on March 17, 2005,

the county re-reviewed the file and gave advance notice that the contract would not be renewed. In addition, Plaintiffs were given the opportunity to be heard by the county commissioners prior to the final decision not to renew the contract. In sum, Defendants are entitled to summary judgment on Count V.

### Count VI: Substantive Due Process

Count VI of the amended complaint asserts a substantive due process claim and Defendants briefed this issue in their motion for summary judgment. Plaintiffs' Brief in Response represents that: "Plaintiffs will withdraw the substantive due process claim, and will not brief it here." The Court has nevertheless reviewed the record, *see* Fed. R. Civ. P. 56(e), and concludes that Defendants are entitled to summary judgment on Count VI.

### Individual Liability and Punitive Damages

The parties have also briefed the issues of whether Breegle, Zecchini and Loughner may be held individually liable, and whether Plaintiffs are entitled to seek punitive damages. Given the entry of summary judgment in Defendants' favor on all counts, the Court need not reach these issues.

### Conclusion

In accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that PLAINTIFFS' MOTION TO STRIKE VARIOUS PARAGRAPHS OF DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS (Document No. 31) is **DENIED**; PLAINTIFFS' MOTION FOR ADDITIONAL DISCOVERY PURSUANT TO RULE 56(f) (Document No. 32) is **DENIED**; PLAINTIFFS' MOTION FOR

PARTIAL SUMMARY JUDGMENT (Document No. 23) is **DENIED**; and DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 26) is **GRANTED**;

SO ORDERED this 20th day of August, 2007.

BY THE COURT:

s/ Terrence F. Mcverry
United States District Court Judge

cc: Edward A. Olds, Esquire
Email: edolds@earthlink.net

Neva L. Stanger, Esquire
Email: nstanger@cdblaw.com